IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WYSINGO TURNER,<br><br>Plaintiff(s),<br><br>v.<br><br>SHERWIN MILES, Acting Warden, Stateville Correctional Center<br><br>Defendant(s). | Case No. 19-cv-0693<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Wysingo Turner, an Illinois prisoner, petitions for a writ of habeas corpus under 28 U.S.C. § 2254. Dkt. 1. The petition is denied, and a certificate of appealability will issue.

**I. Background**

A federal habeas court presumes that state court factual findings are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Jean-Paul v. Douma*, 809 F.3d 354, 360 (7th Cir. 2015) ("A state court's factual finding is unreasonable only if it ignores the clear and convincing weight of the evidence.") (internal quotation marks omitted). The Appellate Court of Illinois is the last state court to have adjudicated Turner's case on the merits. *People v. Turner*, 2015 IL App (1st) 133649-U (Ill. App. Aug. 27, 2015) (unpublished order) (reproduced at Dkt. 7-3). The following sets forth the facts as that court described them, as well as the procedural background of the state criminal and post-conviction proceedings.

1

This case involves the August 12, 2010 shooting and death of Krystal Rodney at her home in West Englewood, Chicago. *Id.* at ¶ 3.

At trial, Rodney's son, Demar'J Bankston, testified that he was twelve at the time of the shooting and living with Rodney in the basement of a relative's house. *Id.* He testified that on the morning of August 12, he saw Wysingo Turner arrive at the house in a silver BMW. *Id.* Turner had a conversation with Rodney that Bankston did not hear and then Turner left. *Id.* Turner returned later that day and asked Bankston where Silvia Gandy, Rodney's half-sister, was. *Id.* After learning Gandy was not home, Turner then asked where he could find Rodney and Bankston told him she was in the basement. *Id.*

Turner then knocked on the basement window, Rodney came outside, and an argument between them began. *Id.* Bankston testified that Turner pulled a silver gun from the back of his pants and aimed it at Turner. *Id.* at ¶ 4. Rodney said, "I'm sorry," and then Turner shot her in the neck. *Id.* Turner shortly thereafter drove away. *Id.* A neighbor and relative present at the shooting also testified at the trial, largely consistent with Bankston's testimony. *Id.* at ¶¶ 5-6. Turner was arrested soon after the shooting. *Id.* at ¶ 8.

Turner testified in his own defense at trial. *Id.* at ¶ 11. He testified that after he first arrived at the West Englewood property on the morning of August 12, he was kicked from behind by Rodney, knocking him down. *Id.* at 13. In response, Turner left and drove to Ogden Park. *Id.*

He later returned to the house, where he got out of his car and took his gun. *Id.* at ¶ 14. He regularly carried a loaded gun in his car for protection and testified that he took it with him because there were often "thugs" on the property. *Id.* at ¶¶ 13-14. Turner testified that Rodney approached him as he walked towards the house and grabbed the gun from him, pointing it at him. *Id.* at ¶ 14. Turner grappled with her for control of the gun and, in the struggle, it fired and hit Rodney. *Id.* Turner denied pulling the trigger. *Id.*

On cross examination, the prosecution questioned Turner about his firearm:

"Q. And it's a revolver, correct?

A. Yes, it is.

Q. And you say you carried it in your car for protection?

A. Yes, I do.

Q. And it's against the law to carry your gun in the car, isn't it?

A. No, it's not.

[Objection overruled]

Q. And it's against the law to carry a loaded gun on the streets of the City of Chicago when you're driving your car, correct?

A. No.

Q. And you think you are entitled to just break the law, correct?

A. I never known it was a law."

*Id.* at ¶ 48. The exchange was recalled at closing arguments, when the prosecution said:

3

> Let's just talk about a couple of things. 'I drove with a loaded gun in my car. I always drive with a loaded gun in my car.' Apparently he doesn't care about the law, because he can pick and choose the law that he does or does not want to follow.

*Id.* at ¶ 50.

The jury found Turner guilty of first-degree murder and personally discharging a firearm that proximately caused the victim's death. *Id.* at ¶ 16. He was sentenced by the trial court for 35 years for the murder and a consecutive 25-year term for discharging the firearm. *Id.*

Turner appealed to the Appellate Court of Illinois, contending that he suffered from ineffective assistance of counsel and various trial court errors. *Id.* at ¶ 1. Among the claimed errors was that the State violated Turner's Second Amendment rights when it questioned whether he knew it was illegal to carry a gun in his car. *Id.* at ¶ 48. The Appellate Court affirmed the lower court, and the Supreme Court of Illinois denied Turner's petition for leave to appeal. *Id.* at ¶ 1; Dkt. 7-5.

In September 2016, Turner filed a postconviction petition consistent with state law. The trial court dismissed the petition and was affirmed on appeal. Dkt. 7-9. The Supreme Court of Illinois denied his petition for leave to appeal in November 2018. Dkt. 7-11. He then timely filed the instant habeas petition on February 2, 2019. Dkt. 1.

4

**II.  Standard**

Turner brings his habeas claim under 28 U.S.C. § 2254. § 2254(d) states that the writ will not be granted if it was already adjudicated on the merits in state court. There are only two exceptions to this rule: 1) if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or 2) if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)"). Turner does not argue that the evaluation of the evidence was unreasonable, and so we focus here on the first exception.

In determining whether a state court decision was contrary to clearly established federal law, we look to "the holdings, as opposed to the dicta, of [the Supreme Court]'s decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 365 (2000). To be overturned, the state court's application of the law must have been "objectively unreasonable." *Id.* at 409. In making this determination we focus on Supreme Court precedent, as "circuit precedent does not constitute clearly established Federal law." *Glebe v. Frost*, 574 U.S. 21, 24 (2014).

Importantly, finding a decision "unreasonable" is a higher standard than merely "incorrect." *Williams*, 529 U.S. at 411. This Court "may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court

5

decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*.

### III. Analysis

#### A. The State Court's Ruling Was Not Contrary to Clearly Established Federal Law

In this habeas petition, Turner claims one error—that his Second Amendment rights were violated during cross-examination and closing arguments by the trial court allowing the prosecutor to argue Turner's carrying a firearm violated state law. Turner raised this issue on appeal, where the court affirmed the trial court because the "evidence that defendant carried a gun, which was introduced by defendant himself, was relevant as to why defendant had a loaded gun with him on the day in question," distinguishing the case from the precedent Turner had cited. (Dkt. 7-3 at ¶ 11).

As discussed above, on habeas review we look to whether the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). So long as the state court did not violate any "clearly established holding" of the Supreme Court, this Court cannot grant habeas relief. *Woods v. Donald*, 575 U.S. 312, 317 (2015).

Turner has not cited any Supreme Court case that clearly establishes that questioning a defendant during a criminal trial about their possession of a firearm in violation of state law violates the defendant's Second Amendment rights. The Court's own review of Supreme Court precedent has not uncovered any such case. Indeed,

6

the Supreme Court has not yet addressed a case close to this question. This is a situation in which "none of [the Supreme Court's] cases confront the specific question presented by this case," and so, ipso facto, "the state court's decision could not be contrary to any holding" of the Supreme Court. *Woods*, 575 U.S. at 318 (citations omitted). Thus, this Court cannot grant Turner a writ of habeas corpus.

### B. *Heller*, *McDonald*, and *Dawson* Do Not Create a Clearly Established Federal Law

Turner argues that three Supreme Court cases, when read together, actually do create the required "clearly established Federal law." The argument proceeds in two parts. First, he argues that *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) established that Turner's firearm possession in his car was protected by the Second Amendment. Then, he argues that *Dawson v. Delaware*, 503 U.S. 159 (1992) established that questioning Turner in a criminal trial about that firearm possession infringed on his Second Amendment rights. This argument fails. Both its steps require interpretative leaps not found in the holdings of the cases. While Turner's reading of the case law is plausible, it is far from "clearly established," the standard for granting habeas.

*1. Supreme Court Precedent Has Not Established* Heller *and* McDonald*'s Scope Outside the Home*

At the time of Turner's arrest, the Illinois Aggravated Unlawful Use of a Weapon statute generally prohibited the carrying of an uncased, loaded gun in public. *See* 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (2010). In the 2013 case *Moore v. Madigan*, 702 F.3d 933, 934 (7th Cir. 2012), the Seventh Circuit held that the statute violated the Second

7

Amendment. The Illinois legislature has subsequently amended the law to provide an exception for properly licensed handguns. *See* 720 ILCS 5/24-1.6(a)(3)(A-5) (2018).

In *Moore*, the Seventh Circuit relied on the Supreme Court precedent of *Heller* and *McDonald*. *Heller*, which was the Court's "first in-depth examination of the Second Amendment," held that a District of Columbia law that prohibited keeping a handgun in one's home violated the Second Amendment. *D.C. v. Heller*, 554 U.S. 570, 635 (2008). *McDonald* then held that the Fourteenth Amendment incorporated the Second Amendment against the states. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010).

Turner argues that even though his carrying a loaded gun in his car violated Illinois law, it was inappropriate for the prosecutor to describe his actions as "against the law" because the Illinois statute clearly violated the Second Amendment. Turner points to language in *Heller* and *McDonald* to argue that the opinions found an "inherent right of self-defense" that necessarily extended to keeping a loaded handgun in one's car. *Heller*, 554 U.S. at 628. Turner cites *Moore* to support the view that such a right has been clearly established.

*Moore*, however, is not controlling in this case because we may only look to Supreme Court precedent to determine if a particular right has been clearly established. *See Glebe v. Frost*, 574 U.S. 21, 24 (2014). And while *Heller* and *McDonald*'s language is sweeping, the actual holdings of the cases are limited to the domestic context. Looking at these decisions alone, it is unclear just how far they go in overturning state firearm regulations.

Turner suggests that even if the cases' holdings are not directly applicable, their "fundamental principles" leave only one possible conclusion. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 258 (2007) (warning that "ignoring the fundamental principles" of Supreme Court precedent will result in decisions contrary to federal law). But *Moore* itself undermines this argument. Judge Williams dissented from the majority opinion in *Moore*, writing that she is "not convinced that the implication of the *Heller* and *McDonald* decisions is that the Second Amendment right to have ready-to-use firearms for potential self-defense extends beyond the home." *Moore v. Madigan*, 702 F.3d 933, 946 (7th Cir. 2012) (Williams, J., dissenting). *Heller* and *McDonald*'s logic may extend to finding the Illinois statute unconstitutional, but other readings, emphasizing the historical primacy of the home as the place where the "importance of the lawful defense of self . . . is most acute," are also reasonable. *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 559); *see Moore*, 702 F.3d at 943-954 (setting forth this argument in detail).

If a federal appellate court judge could reasonably find the Illinois statute constitutional, then, almost by definition, its unconstitutionality is not "clearly established." This is an archetypal example of a situation in which "fairminded jurists could disagree." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). As such, we cannot overturn the state court's ruling on habeas review.

2. Dawson *Does Not "Clearly" Apply Outside the First Amendment Context*

*Heller* and *McDonald* are only the first step in Turner's argument. As he acknowledges in his petition, those cases "do not reach the question of whether a

9

defendant's second amendment rights are violated not only by a criminal prosecution for possessing a gun but also by the invocation of an unconstitutional gun statute during the course of a prosecution for a different offense." Dkt. 1 at 24. To bridge that gap, Turner tuns to *Dawson v. Delaware*, 503 U.S. 159 (1992).

*Dawson* dealt with a defendant who had escaped from state prison, murdered a woman, and stole her car. *Id.* at 160-61. At trial, the prosecution and defense stipulated to the defendant's membership in the Aryan Brotherhood, a white racist prison gang. *Id.* at 162. The jury found the defendant guilty and he was sentenced to death. *Id.* at 163. On appeal, the Supreme Court found that the introduction of the defendant's membership in the prison gang violated his First Amendment rights. *Id.* The Court reasoned that the information was not actually relevant to his guilt or sentencing, and so the evidence was exclusively to prove "Dawson's abstract beliefs." *Id.* at 167. This, in turn, implicated the established First Amendment principle that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id.* (quoting *Texas v. Johnson,* 491 U.S. 397, 414 (1989)).

Turner reads *Dawson* broadly. He describes its holding as being that a "defendant's rights are violated when the prosecution introduces irrelevant evidence in violation of specific right guaranteed to the defendant under United States Constitution." Dkt. 8 at 8-9. Turner's Second Amendment rights were thus violated when irrelevant evidence, that he carried his gun in violation of state law, was introduced at his trial.

*Dawson* itself, however, is much more limited in scope. In its own description of its holding, it expressly limits its application to the First Amendment. *Dawson*, 503 U.S. at 160 (holding that "the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding").

What is more, it is not clear that its reasoning readily applies outside the First Amendment context. The opinion grounds itself in First Amendment jurisprudence, invoking previous precedent that had established the Amendment's particularly expansive reach. *Id.* at 168 (citing cases that limited states' ability to control bar membership or gather information on private organizations). It is perhaps unsurprising, then, that neither the Supreme Court nor the Seventh Circuit have applied *Dawson*'s holding outside of the First Amendment.

Given the limited language and reasoning of *Dawson*, it is not "objectively unreasonable" for the state court to have failed to apply its reasoning to Turner's Second Amendment claim. Yet again, this is an extension of Supreme Court precedent about which "fairminded jurists could disagree." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). As a result, the state court did not act contrary to clearly established federal law by allowing the testimony.

### C. A Certificate of Appealability Is Warranted

When a district court enters a judgement on a habeas petition, it must also deny or grant a certificate of appealability. 28 U.S.C. § 2253(c). Such a certificate will only

11

be issued if the applicant has made a "substantial showing of the denial of a constitutional right." *Id*. Or, as the Supreme Court puts it, "[w]here a district court has rejected the constitutional claims on the merits . . . [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although we have found Turner's argument unpersuasive, a reasonable jurist could disagree with our assessment of *Heller*, *McDonald*¸ and *Dawson*. So, a certificate of appealability is granted.

## IV. Conclusion

For the stated reasons, Turner's petition for a writ of habeas corpus is denied, but a certificate of appealability will issue.

E N T E R:

Dated: December 3, 2020

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

12